than the claim is analogous to a standard tort claim and the availability of a state-tort remedy is very relevant.

■ This Court's review of all the relevant caselaw indicates that plaintiffs have failed to state a cognizable § 1983 claim for violation of substantive due process rights. Plaintiffs have done nothing more than allege numerous acts of negligence and violation of state law by defendant Gault. Even a bad faith violation of state law fails to reach the level of a constitutional violation. *Anderson v. Douglas County*, at 577; *McNees v. Mountain Home, Ark.*, at 1361; *Chesterfield Dev. Corp. v. City of Chesterfield*, 963 F.2d 1102, 1105 (8th Cir.1992). Defendant Gault's actions, as alleged, do not indicate decisive acts reflecting abusive or oppressive government conduct. Plaintiffs have failed to allege acts so outrageous as to amount to a substantive due process claim. The simple fact that defendant Gault is a police officer fails to take an ordinary tort claim for personal injury and turn it into a constitutional violation.

As noted before, since plaintiffs' complaint fails to state a cognizable § 1983 claim against defendant Gault, their § 1983 claim against the City of Overland also fails. Both motions to dismiss will be granted.

**TEAMSTERS NATIONAL FREIGHT INDUSTRY NEGOTIATING COMMITTEE, on Behalf of Virgil HOWE, Gary Southers, John Hogan, Rosetta G. Cavan and Other Persons Similarly Situated, Plaintiffs,**

v.

**CHURCHILL TRUCK LINES, INC., Defendant.**

**No. 94–1004–CV–W–8.**

United States District Court, W.D. Missouri, Western Division.

Aug. 9, 1996.

Kevin F. Fagan, Schuchat, Cook & Werner, St. Louis, MO, for Plaintiffs.

Robert J. Harrop, Lathrop & Gage, L.C., Kansas City, MO, for Defendant.

## ORDER

STEVENS, District Judge.

This is a class action brought by the named plaintiffs on behalf of all Teamster represented employees of Churchill Truck Lines, Inc. ("CTL") employed at facilities or terminals with more than fifty employees at the time of CTL's closure on April 11, 1994.[1] Plaintiffs claim that CTL closed without giving them sixty days notice, as required by the WARN Act, 29 U.S.C. § 2102(a). Plaintiffs contend that defendant preplanned the closing, using the strike as a pretext for closing to evade the notice requirements of the WARN Act and its obligations under a collective bargaining agreement. Defendant CTL claims that it was exempt from the notice requirement because the closing related to or was caused by a strike, 29 U.S.C. § 2103, and because the closing falls within the business circumstance exception, 29 U.S.C. § 2102(b)(2)(A). Having heard the evidence in this case on May 20 and 21, 1996, observed the demeanor of the witnesses, studied the documents admitted and considered the arguments of counsel, the Court enters the following findings of fact and conclusions of law.

### Findings of Fact

Defendant Churchill Truck Lines, Inc. is a Missouri corporation with its principal office and place of business in Chillicothe, Missouri. It is a wholly owned subsidiary of Churchill Freight Systems, Inc. ("CFS"), a privately held Missouri corporation. CFS is the sole shareholder of CTL. The boards of directors of the two corporations are the same and consist primarily of the Churchill family. Kenneth Churchill has been president and chairman of the board of directors of CTL since 1952.[2]

CTL was founded in 1926 by Kenneth Churchill's father as a common carrier engaged in the transportation of general commodity freight by motor vehicle. By 1994, it owned and operated approximately 58 terminals with appropriate rolling stock throughout the United States and employed about 2,250 people.

In 1994, between 1500 and 1700 of CTL's employees were represented by local unions associated with the International Brotherhood of Teamsters ("IBT" or "Teamsters"). The terms and conditions of their employment were governed by a collective bargaining agreement called the National Master Freight Agreement ("NMFA" or "the Agreement"). Since the 1960s, the Teamsters National Freight Industry Negotiating Committee ("TNFINC") negotiated the NMFA on behalf of CTL's union employees.

Trucking Management, Inc. ("TMI"), a multi-employer bargaining agent, negotiated the NMFA on behalf of CTL and other member companies which had provided advance written authorization to TMI to bargain on their behalf. Unless released by TMI, member companies were not authorized to negotiate or execute collective bargaining agreements on their own behalf. In addition, TNFINC was obligated to conduct all negotiations with TMI member companies through TMI.

Prior to 1980, negotiations between TMI and TNFINC were characterized by strife. Before reaching an agreement, there were strikes or lockouts in 1973, 1976 and again in 1979. In 1980, Congress deregulated the trucking industry. Non-union competition increased. After deregulation, and specifically in 1982, 1985, 1988 and 1991, agreements were reached on the NMFA without strike or lockout.

The 1991 NMFA expired on March 31, 1994. TNFINC and TMI commenced negotiations for a successor NMFA on December 21, 1993. Negotiations continued throughout the first quarter of 1994. Little progress was made in January and February, 1994. In mid-March 1994, the local unions voted to authorize a strike, should their bargaining representatives deem it to be necessary. This was not unusual. Negotiations between these parties normally followed this pattern

---

1. The court certified the class upon stipulation of the parties. Notice was provided to the class on January 15, 1996.

2. In this Order, "Mr. Churchill" is used interchangeably with Kenneth Churchill. All other Churchill family members are referred to by their full name.

and similar strike votes had been held in connection with prior negotiations which had not resulted in strikes. The outcome of the mid-March vote was neither announced or publicized. Neither the Teamsters, TNFINC, nor the local unions threatened to strike. In addition, the board of directors of TMI did not discuss the possibility of strike throughout the negotiations which led to TMI's final proposal.

On March 31, 1994, TMI made a final proposal which was rejected by TNFINC. Thereafter, TNFINC requested and received an extension of the collective bargaining agreement until midnight of April 5, 1994 to consider a strike. On April 5, 1994, representatives from each of the Teamster Local Unions covered by the NMFA voted to strike at 12:01 a.m. E.S.T. on April 6, 1994.[3]

TNFINC negotiated interim agreements with two trucking companies which were not struck, but refused interim agreements with many other trucking companies. TNFINC considered offering an interim agreement to CTL, but ultimately failed to do so. Specifically, although a TNFINC representative was told that only Kenneth Churchill had authority to consider an interim agreement, TNFINC made no attempts to phone Mr. Churchill, nor to deliver to him any interim agreement for his consideration.[4] Mr. Churchill in turn made no attempts to obtain an interim agreement, based upon his belief that he was not authorized by TMI to do so.[5]

In any event, the strike was selective. The local unions were not required to strike CTL. Union officials testified that they could have allowed CTL to continue to operate even absent the negotiating of or signing of an interim agreement.

All of defendant Churchill's terminal locations were included in the strike, and CTL's revenue-producing trucking operations were completely halted on April 6, 1994. CTL began the process of contacting other carriers for their assistance in transporting perishable commodities. Approximately 500 non-union employees continued to report to work.

On Saturday, April 9, 1994, the board of directors of Churchill Truck Lines, Inc. met to discuss the impact of the strike. Based upon extensive experience and knowledge of the company, Kenneth Churchill explained that the company's non-striking employees would have to be paid throughout the strike in order to maintain them as employees after the strike. Kenneth Churchill estimated that the strike would last one month,[6] that the company would lose $400,000 to $500,000 a week during the strike, and that 15% to 20% of CTL's business would not return after the strike. Based upon these conclusions and the anticipated loss which would result from a reduction in customer base, Kenneth Churchill recommended that CTL completely and permanently close all of its trucking operations before substantial assets were depleted by the strike. CTL's board of directors unanimously recommended to the shareholder (CFS) that CTL cease operations. CFS adopted this recommendation; trucking operations ceased as of 12:01 a.m. on April 11, 1994. By letter dated April 9, 1994, CTL informed the Teamster Local Unions of its decision to close.

In their complaint, plaintiffs contend that CTL planned the closing in advance of the strike and used the strike as a pretext to avoid the notice requirements of 29 U.S.C. § 2101 et. seq., commonly referred to as the WARN Act. At trial, plaintiffs argued that

3. This was referred to as the "two-man committee meeting" because the voting delegates consisted of two members from each local union.

4. The Court finds the testimony of Kenneth Churchill and Gordon Ringberg to be credible. Kenneth Churchill signed all collective bargaining agreements on behalf of CTL. Thus, Gordon Ringberg expressly told an inquiring union representative that Kenneth Churchill was the person to contact; he did not represent that CTL was "not interested," as claimed by plaintiffs.

5. Churchill had never been offered an interim agreement, and CTL had never been excluded from a selective strike. Indeed, Kenneth Churchill did not know what an interim agreement was, nor did he know what the union was interested in proposing in this instance. Since he was the only person with authority to sign a collective bargaining agreement on behalf of CTL, he assumed that he would be contacted if there were any serious proposals.

6. The actual strike lasted twenty-three days.

the closing was unrelated to the strike, but instead occurred because Kenneth Churchill wanted out of TMI and the collective bargaining agreement. The Court disagrees and specifically credits Kenneth Churchill's testimony in this regard. Kenneth Churchill did not recommend that CTL close to avoid a collective bargaining agreement which had not yet been formulated,[7] and he did not close to evade the notice requirements of the WARN Act. Churchill did not foresee a strike, and he did not plan the closing of CTL's trucking operations prior to the April 6, 1994 strike.

CTL had been a member of TMI or its predecessors since the late 1960s. Indeed, Kenneth Churchill, as one of the original founders of TMI and a member of the TMI board of directors, was a strong supporter of TMI. He firmly believed that any company attempting to bargain with the union outside of TMI would have absolutely no influence in the negotiations. Thus, in spite of his personal belief that the financial packages negotiated in 1982, 1985, 1988, 1991, and the final package offered March 31, 1994, were "too costly," CTL repeatedly authorized TMI to negotiate on its behalf, consistently adhered to the collective bargaining agreements negotiated between TMI and TNFINC, and steadfastly worked within the system to find other ways to cut costs and maintain profitability.

Specifically, in 1993, Kenneth Churchill proposed, and the union accepted, a profit-sharing plan funded by a 10% wage reduction. CTL paid $125,000 to an outside consultant to study CTL and make recommendations for changes in CTL's operations. These recommendations were implemented in December, 1993, the same month that TMI, as authorized by CTL and other member companies, began negotiations for a new collective bargaining agreement. Between 1992 and throughout the first quarter of 1994, in spite of the 'costly' agreements under which it operated, CTL spent nearly $400,000 training its employees.

In 1993, CTL spent over $1,100,000 to purchase new tractors and $500,000 to purchase new forklifts. Throughout negotiations and until the commencement of the strike, CTL solicited new business, entered into long-range contracts with various shippers, and invested in computers and a telephone system. In early 1994, CTL published pricing information that would not become effective until after the date of the strike. In March and April, 1994, CTL paid licensing fees covering all of 1994, and filed tariffs, effective after April 1, 1994, with the ICC. In summary, throughout the period of negotiations and until the strike of April 6, 1994, Kenneth Churchill and CTL were engaged in long-range planning and an ongoing effort to improve future trucking operations.[8]

Kenneth Churchill's recommendation to close, as adopted by CTL's board of directors and CTL's sole shareholder, CFS, was the direct result of the strike, and it would not have been made but for the strike.[9] CTL

---

7. The Court draws no inference adverse to defendant from the fact that after the strike commenced, and on or about the same time that Kenneth Churchill recommended the closing of CTL, Churchill asked for permission to withdraw from TMI. This request was logically based upon Churchill's belief that participation in TMI, after the closing of operations, was unnecessary and served no real purpose. Moreover, the Court notes that, based upon TMI's May 1994 decision to reject the request, CTL remains bound by the terms of the 1994 National Master Freight Agreement.

8. At trial, plaintiffs' attorney agreed that CTL continued to expend money throughout the period of negotiations "as if it were going to continue in existence." Tr. at 184.

9. In making this finding, this Court has considered the evidence as a whole, including but not limited to the April 9, 1994, letter in which Churchill notified CTL's employees that the "economic impact of the continuing strike" and "recent developments within the multi-employer bargaining unit have forced this action upon the Company." As Churchill explained at trial, "recent developments" related to TMI's general inability to reach or to obtain an agreement, not to any particular provisions of the final proposal.

The fact that the parties failed to reach an agreement was a logical condition precedent to the strike. Thus, this Court will not place undue reliance upon defendant's vague reference to "recent developments." In light of the evidence, and in light of the preceding phrase which cites the strike as a cause for the closing, this ambiguous reference does not justify a finding, as urged by plaintiffs, that the closing was unrelated to the strike or a finding that defendant used the strike as a pretext to evade the law.

had struggled in the past against non-union competition, and Kenneth Churchill believed that a substantial portion of CTL's customers would transfer to the many non-union companies which would service them during the strike. He further believed that he owed a fiduciary duty, as president, to act promptly to preserve the assets of the company before they were depleted by the strike and by continued operation without a sufficient customer base, a direct result of the strike.

Kenneth Churchill did not believe a written analysis was necessary or required to arrive at these conclusions. He had led CTL through strikes in the past. He had extensive experience and knowledge about the company at his fingertips, and all or nearly all of the members of the board of directors had at least 20 years of experience with the company. A delay of the closure to obtain an analysis would result in the needless depletion of company assets. Thus, this Court finds that no inference adverse to defendant should be drawn from the board's decision to act promptly.

Mr. Churchill discussed all ramifications of closing with legal counsel. This was a difficult decision for him; he had devoted his life to build CTL. Several family members would be among the many persons who would face unemployment. Financially, CTL would become liable for pension withdrawals in excess of 14 million dollars that could have been avoided by continuing in business.

Moreover, this Court draws no adverse inference from the fact that one family member, Fred Churchill, left unemployed by the closing, was hired by another trucking operation, Eagles Freightways, in which he has no ownership interest. This Court draws no adverse inference from the fact that Kenneth Churchill's nephew, Cliff Churchill, started a relatively small trucking operation, CBC Express, and purchased a small amount of CTL equipment.

Kenneth Churchill, who continues as CTL's president, was and remains unaware of the operations of either Eagle Freight-

ways or CBC Express. CTL made no special agreements to sell its equipment to the Churchill family. CTL sold its rolling equipment at public auctions to the highest bidder in arm's length transactions. Contrary to the allegations of plaintiffs, the evidence indicates that CTL did not reopen its trucking operations under other names.[10]

### Conclusions of Law

The WARN Act, 29 U.S.C. § 2101 et seq., covers any site of employment having 50 or more employees, and generally requires an employer to give its employees sixty days advance written notice of any plant closing or mass layoff. 29 U.S.C. § 2102(a). In this case, defendant's decision to close its trucking operations on April 11, 1994, constituted a "plant closing or mass layoff" as that term is defined in WARN, 29 U.S.C. § 2101(a)(2). Defendant closed its operations without giving its employees or their union representatives sixty days notice prior to the closing, but advance notice was not required in this instance.

The Warn Act contains a "strike exemption." Specifically, 29 U.S.C. § 2103 provides that the Act "shall not apply to a plant closing or mass layoff if . . . the closing or layoff constitutes a strike or constitutes a lockout not intended to evade the requirements of this chapter." The Code of Federal Regulations explains that "[a] plant closing or mass layoff at a site of employment where a strike or lockout is taking place, which occurs for reasons unrelated to a strike or lockout, is not covered by this exemption. An employer need not give notice when permanently replacing a person who is deemed to be an economic striker under the National Labor Relations Act." 20 C.F.R. § 639.5(d).

The Act also contains a "business circumstance exception" which permits the shortening or elimination of the notice period "if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time notice would have been required."[11] 29 U.S.C. § 2102(b)(2)(A). As explained in 20 C.F.R. § 639.9(b),

---

**10.** Kenneth Churchill is still president of CTL, which now leases its terminals.

**11.** As explained in 20 C.F.R. § 639.5, this exception is necessary to cover those situations in which a strike affects non-striking employees at

(1) [An] important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control....

(2) The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market....

■ The "business circumstance exception" still requires the employer to "give as much notice [of the closing] as is practicable" once the causal event becomes known. 29 U.S.C. § 2102(b)(2)(A). *See also, Jones v. Kayser–Roth Hosiery, Inc.*, 748 F.Supp. 1276 (E.D.Tenn.1990). However, it does not impose upon an employer a requirement to provide sixty days notice or continue in business to its detriment for the sixty-day notice period, simply because it is economically feasible or possible to do so. *See Jurcev v. Central Community Hospital*, 7 F.3d 618 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1830, 128 L.Ed.2d 459 (1994). The Act thus provides protection for those employees who play no part in the closing, while continuing to balance the legitimate business concerns of an employer faced with an unforeseeable business circumstance.

■ While other courts have been asked to apply the "business circumstance exception," this appears to be a case of first impression with respect to the "strike exemption." [12] In contrast to the "business circumstance" exception, the "strike exemp-

tion" appears to place a less onerous burden upon the employer who need only prove that the closing "related" to the strike, to be exempted from the sixty-day notice requirement. Foreseeability and direct causation are not at issue. Thus, the protection otherwise afforded employees by the WARN Act is lifted and striking employees are shouldered with some of the responsibility for their decision to strike.

[3] Plaintiffs in this case are comprised solely of the union-affiliated striking employees of Churchill Truck Lines, Inc. Collectively, this class had reason to know that the strike would adversely affect their employer's ability to compete in a deregulated industry.[13] They knew or had reason to know that a strike could break the strong bonds and sense of loyalty which had permitted this company to thrive in the past with union employees. Union officials testified that they had not commenced a strike since deregulation, despite the regularity of impasses during negotiations. Strikes, costly to all parties, had become a thing of the past. Thus, the local union members, in voting to strike, had reason to know that this "bargaining technique" could run contrary to their own interests, as well as those of the company. The strike was selective; these employees were not required to strike CTL, regardless of whether an interim agreement was negotiated. The risks were apparent.

CTL and its president Kenneth Churchill did not plan to close their trucking operations at any time prior to the strike and did not foresee the strike or consider its impact before it occurred. CTL had a history of working with the union.[14] It specifically

the same plant as striking employees. Because use of the exception is not limited to non-striking employees, we shall discuss it in the context of this case.

12. The "exceptions" of the WARN Act, including the "business circumstance exception," are treated as affirmative defenses; thus, the employer has the burden to prove that its actions are covered by the exception. See 20 C.F.R. § 639.9. Absent authority to the contrary, we assume that the employer also bears the burden of proof with respect to the "strike exemption."

13. One union official testified that the union researched the potential impact of the 1994 strike, and that he was aware that some companies might go out of business as a result of the strike. Tr. of Skelton at 144.

14. Kenneth Churchill worked with the union, despite his personal feeling that the negotiated contracts were unreasonable, to develop profit sharing plans and other cost saving programs which would permit the company to remain operable, even under the union contracts. He spoke at local union meetings, and made it clear that he expected the union and the company to support each other and to share the burdens

agreed to continue as a member of TMI prior to December 21, 1993, when the negotiations for a new collective bargaining agreement began, despite its president's personal belief that the last several contracts were too costly. It expended substantial funds training its employees and purchasing expensive equipment throughout 1993 and the first quarter of 1994. It continued soliciting customers throughout this period and entered into long-range contracts.[15]

But for the strike, Kenneth Churchill intended to keep his trucking operations going, as he had in the past, and to work within the confines of the collective bargaining agreement. It was only after Kenneth Churchill assessed the impact of the strike that he recommended closing the operations he had worked all of his life to build. He considered the immediate losses to his company of $400,-000 to $500,000 a week, and the impact of continuing operations in a deregulated industry with a 15% to 20% loss in customer base. His recommendation, made in a fiduciary capacity, was the only way he knew to preserve the company's assets which would otherwise be lost as a direct result of the strike.

The strike was a business circumstance which would potentially, realistically, significantly and detrimentally impact the operations of the company. It formed the basis for a sound business decision; it was the tip of the iceberg, and the straw that broke the camel's back. CTL, a 68-year old institution, had every right to close rather than lose millions of dollars in assets during the strike just so that it could, at some unknown time, remain in operation with the lower customer base which it would have as a direct result of the strike.[16]

Moreover, the strike was an unexpected action outside the employer's control; it was not reasonably foreseeable as of the date notice would have been required. There had not been a trucking strike since the deregula-

tion of the industry in or about 1980, in spite of frequent impasses in negotiations, and in spite of the fact that the union had voted to authorize a strike during negotiations in the past. The possibility of a strike was not even discussed by the TMI board members. No person, including the union officials, could accurately or reasonably forecast a strike until the final vote was taken, and certainly not sixty days prior to the closing. There was no requirement that CTL agree to Union demands to avoid a strike, and no requirement that it expend its assets without profit during the period of the strike.

In summary, this Court finds that CTL, the employer, has met its burden of proof. The strike exemption applies because the closing related to the strike; moreover, it was not intended to evade the requirements of the law. The business exception applies because the closing was caused by a business circumstance, the strike, which was not reasonably foreseeable sixty days prior to the closing, or on or about February 10, 1994. Once it occurred, however, the defendant company did not linger in taking action; CTL notified its employees of its decision to close within a reasonable amount of time following the beginning of the strike. Accordingly, it is

ORDERED that Judgment be entered in favor of defendant, with costs assessed against plaintiff.

---

placed upon them as a consequence of deregulation.

**15.** In contrast to the allegations in the complaint, there was no evidence that defendant began to liquidate assets prior to the strike, and no evidence that defendant simply resumed trucking operations under another name to avoid his obli-

gations under the WARN Act or the negotiated collective bargaining agreement.

**16.** In other words, CTL exercised "such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market." See 20 C.F.R. § 639.9(b).