No. 95-3964

Dennis W. Loehrer; Stephen D. Brandt,

       Plaintiffs - Appellants,

James L. Loretta; Elmer W. Yordt; Richard L. Darling, on their own behalf and on behalf of all others similarly situated,

       Plaintiffs,

v.

McDonnell Douglas Corporation,

       Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of Missouri.

Submitted:  June 12, 1996

Filed:  October 22, 1996

Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON, Circuit Judge, and KORNMANN,[1] District Judge.

FLOYD R. GIBSON, Circuit Judge.

    This appeal represents yet another chapter in the litigation surrounding the United States Navy's turbulent, controversial, and ultimately unsuccessful attempt to design and manufacture the A-12 Avenger II fighter-bomber, extolled for years as the Service's "number one aviation priority." Appellants Dennis Loehrer and Stephen Brandt are former employees of appellee McDonnell Douglas Corporation ("McDonnell Douglas"), which along with the General

---

[1]The HONORABLE CHARLES B. KORNMANN, United States District Judge for the District of South Dakota, sitting by designation.

Dynamics Corporation ("General Dynamics") served as contractor for the A-12 program. Following months of communications between the Government and the contractors which varied from contentious to conciliatory, the Secretary of Defense, Dick Cheney, withdrew support for the A-12 on January 7, 1991, and the Navy canceled the contract on that same day. As a consequence, McDonnell Douglas found it necessary to terminate the employment of thousands of workers in the St. Louis area. Loehrer received written notice on January 15, 1991 that he was to be laid off effective January 29, 1991; Brandt's notice of January 14, 1991 indicated that his last day of employment with the company would be January 25. Loehrer and Brandt subsequently initiated this suit in the United States District Court for the Eastern District of Missouri, claiming that McDonnell Douglas violated the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101-2109 (1994)(the "WARN Act"), by failing to give 60 days notice before the company implemented a mass layoff. McDonnell Douglas concedes that it did not comply with the time period customarily prescribed by the WARN Act, but it maintains that the statute's exception for "unforeseeable business circumstances" applies to excuse the shortened notice in this case. After a two day bench trial, the district court[2] entered judgment in favor of McDonnell Douglas. Loehrer and Brandt appeal, and we affirm.

## I.   BACKGROUND

On January 13, 1988, the Navy contracted with McDonnell Douglas and General Dynamics for the full scale engineering development of the A-12. On April 26, 1990, Secretary Cheney presented to the House Armed Services Committee the results of a Major Aircraft Review ("MAR") of four ongoing development programs, including the A-12. Based on the MAR, the Secretary believed that

---

[2]The HONORABLE EDWARD L. FILIPPINE, Senior United States District Judge for the Eastern District of Missouri.

there were no major impediments to the timely completion of the A-12 program.  In his testimony before the Committee, the Secretary recommended a reduction in the number of A-12 Avengers to be produced, but he underscored that the aircraft remained "one of our most urgent requirements."

Soon after the Secretary uttered these optimistic remarks, the A-12 program, and the relationship between the contractors and the Government, plunged into a downward spiral.  By mid-1990, it was apparent that McDonnell Douglas and General Dynamics were experiencing considerable difficulties with the program and were unlikely to complete the project on time and within budget.  The contractors discovered that production of the jet would be more troublesome than expected due to unanticipated problems with the manufacture of the aircraft's "big ribs."  Due to this realization, McDonnell Douglas generated a contingency plan describing the options it would consider if the Navy refused to restructure the A-12 contract.  One of these options included claiming "commercial impracticability to perform."

On June 13, 1990, McDonnell Douglas and General Dynamics informed Lawrence Garrett, Secretary of the Navy, that the full scale development costs would overrun the contract ceiling price[3] by an amount the contractors could not absorb, and the companies requested that the Navy consent to restructure the agreement.  Approximately one month later, the Navy formally notified the contractors that they had failed to deliver the first aircraft as required by the contract and that the entire A-12 program was in jeopardy.  Subsequently, on August 17, 1990, the Navy approved a

---

[3]The A-12 contract was a fixed-price agreement with a target price of approximately $4.4 billion.  The Government committed to pay all costs up to that amount.  Costs between the target price of $4.4 billion and the ceiling price of approximately $4.8 billion were shared by the Government and the contractors: the Government paid sixty percent of the costs and the contractors paid forty percent.  The contractors assumed all costs above the ceiling.

modification of the contract which unilaterally reestablished the delivery schedule, but it specifically reserved the right to an equitable adjustment in price as consideration for revising the time-line.

By letter dated September 5, 1990, McDonnell Douglas and General Dynamics asserted that the Government had obligated insufficient funds to the A-12 project to cover the corporations' costs. The contractors asked for additional funds to be provided at a more rapid rate "to preclude the possibility that the contractors may have to stop work under the contract." On October 3, 1990, the Navy refused this plea for an accelerated delivery of supplemental funds, but the Government continued to make regular progress payments to the companies through December of 1990.

As it happened, these troubling events coincided with a review of the A-12 by the Defense Acquisition Board ("DAB"). The DAB was responsible for making a final recommendation regarding the continuation of the A-12 program. Before evaluation by the DAB, which was scheduled for December 7, 1990, the A-12 had to successfully undergo several intermediate assessments. One of the most important of these was a phased examination of the A-12 design known as the Critical Design Review ("CDR"). Problems identified during the CDR were discussed at three design review boards. At the last design review board, the chief Navy procurement officer indicated that the parties had fixed the jet's structural problems and that the resulting design would produce an effective aircraft.

Secretary Cheney, who was ultimately responsible for deciding the fate of the fighter-bomber, was also monitoring the progress of the A-12 program. Following his rosy remarks to Congress he, of course, became aware of the complications experienced by the contractors. The Secretary responded by pursuing a positive, yet cautious, approach to ongoing development of the plane. On June 19, 1990, he reiterated his belief that the Avenger was a high

priority Navy program. In October, though, he ordered the Navy to create a new aviation plan that could be activated in the event that the A-12 project failed or was significantly reduced or delayed. Still, in an interview printed in the December 17, 1990 issue of Defense Week, the Secretary refused to speculate on the possible cancellation of the A-12 program. The article reflected the Secretary's understanding that defense contractors often exceed their budgets and fall behind schedule. In fact, the district court determined that "the [G]overnment has rarely ever cancelled a contract for a program for which the [G]overnment had stated a need. In the past, when a contractor encountered difficulty with a contract, either additional funding was provided, the schedule of production was altered, or the output requirement was modified."

In hindsight, it is apparent that the death knell for the A-12 program began to sound in December of 1990. On December 14, Secretary Cheney directed the Navy to "show cause" by January 4, 1991 why the Government should not terminate the contract. By letter dated December 17, 1990, the Navy notified McDonnell Douglas and General Dynamics that the corporations' performance was "unsatisfactory" and that unless specified "conditions are cured by 2 January 1991 the Government may terminate for default." These events prompted McDonnell Douglas to issue advisory memoranda to its workers. On December 20, the company distributed a letter to all its employees explaining that the A-12 program was in danger. The letter further indicated that cancellation of the contract could require the corporation to layoff 4,000 persons, and it stated that employees at immediate risk would receive a follow-up communication. The memorandum concluded, "If you do not receive such a letter you will not be laid off in connection with our near-term actions in response to the possible cancellation of this program." On the next day, December 21, the contractor, as promised, notified roughly 2,500 employees that they would lose

their jobs if the A-12 project were terminated.[4]  Neither Loehrer nor Brandt received the December 21 letter.

On January 2, 1991, the contractors submitted a written response to the Navy's December 17 cure demand, noting that many previously existing problems had been corrected and explaining the current status of the A-12 program.  In addition, the companies offered a proposal for continuation of the project.  On January 2-3, 1991, representatives from the contractors met with Assistant Secretary of the Navy Gerald Cohn; Rear Admiral Morris, the senior A-12 contracting officer; Eleanor Spector, Director of Defense Procurement, Department of Defense; Under-Secretary of Defense Yockey; and several attorneys from the Department of Defense.  After presentation of the contractors' proposal and two days of negotiations, McDonnell Douglas and General Dynamics agreed to absorb a $1.5 billion loss in exchange for a restructuring of the contract, $500 million of which was an up front loss.  Admiral Morris gave McDonnell Douglas a draft of a Memorandum of Understanding outlining terms under which the Navy was willing to rework the A-12 project.  The memorandum evidences that the Navy planned to support the contractors in their application for "extraordinary relief" in the form of an additional appropriation from Congress.  Under-Secretary Yockey told McDonnell Douglas that there was "no[] intent to terminate."

Despite this encouraging meeting, and although Congress had recently expressed continued conditional support for the A-12

---

[4]General Dynamics, McDonnell Douglas's cocontractor, transmitted comparable communications to its employees on the same days.  In a substantially similar suit against General Dynamics, the district court characterized the December 21 letters as "conditional WARN notices."  International Ass'n of Machinists, AFL-CIO v. General Dynamics Corp., 821 F. Supp. 1306, 1310 (E.D. Mo. 1993).  The court proceeded to conclude that General Dynamics had not violated the WARN Act, and the plaintiffs in that case did not file an appeal.

program, Secretary Cheney on January 7, 1991 instructed the Navy to terminate the A-12 contract. Accordingly, the Navy immediately canceled the contract for default. As mentioned above, Loehrer and Brandt received notice early in 1991 that their positions would be eliminated on January 29 and January 25, respectively. The two employees thereafter instituted this suit against McDonnell Douglas and alleged that the company had violated the WARN Act.[5]

After contemplating the evidence, the district court found, and the parties evidently agree, that the layoff in question falls within the WARN Act's general parameters. Therefore, under normal conditions, McDonnell Douglas would have been obliged to give all "affected employees," including Loehrer and Brandt, sixty days notice preceding the terminations. Nonetheless, the district court decided that McDonnell Douglas was excused from the Act's sixty day standard under the exception for mass layoffs caused by "business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A) (1994). The court determined that, throughout the latter half of 1990, the corporation had "exercised reasonable business judgment in continuing to believe that termination [of the contract] would not occur." Because the events precipitating the mass layoff did not become reasonably foreseeable until January 7, 1991, the very date of the contract's cancellation, the court concluded that the company satisfied the WARN Act by giving Loehrer and Brandt as much notice as was practicable. The court recognized that relevant regulations might have permitted McDonnell Douglas to transmit earlier conditional notice to affected employees, but it held that the circulation of such notice is permissive rather than mandatory. On appeal, Loehrer and Brandt challenge the district court's interpretation and application of the "unforeseeable business

---

[5]Though this case originally involved five named plaintiffs, Loehrer and Brandt were the only plaintiffs whose claims proceeded to trial.

7

circumstances" exception.

## II.  DISCUSSION

Under the WARN Act, certain large employers who order a plant closing or mass layoff must provide sixty days advance written notice to, among others, affected employees or their union representatives.  See 29 U.S.C. § 2102(a) (1994).  The purpose of the Act is to extend

> protection to workers, their families and communities by requiring employers to provide notification 60 calendar days in advance of plant closings and mass layoffs.  Advance notice provides workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market.

20 C.F.R. § 639.1(a) (1996).  Though the nearly two-month notice period mandated by the Act goes far to attain these laudable goals, Congress recognized, through the enactment of various exceptions in the statute, that supplying generous advance notice would not be possible, or desirable, in all cases.  See 29 U.S.C. § 2102(b) (1994).  One of these exceptions, pertaining to plant closings or mass layoffs caused by unforeseeable business circumstances, is the focal point of this appeal.  See id. § 2102(b)(2)(A).

### A.    The unforeseeable business circumstances exception

The WARN Act expressly confirms that "[a]n employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required."  Id.  In formulating regulations interpreting this exemption, the Department of Labor ("DOL") was reluctant to list examples of events that would,

8

without deviation, qualify as unforeseeable business circumstances. <u>See</u> Analysis of Final Rule and Comments, 54 Fed. Reg. 16,062 (1989). Rather, the DOL indicated that the propriety of utilizing the exception in any particular scenario involves a highly factual inquiry to be assessed on a case by case basis. <u>Id</u>. at 16,062-63. The regulations explain:

> An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control. A principal client's sudden and unexpected termination of a major contract with the employer . . . might . . . be considered a business circumstance that is not reasonably foreseeable.
>
> *   *   *
>
> The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market. . . .

20 C.F.R. § 639.9(b)(1)-(2) (1996); <u>see also</u> 54 Fed. Reg. 16,063 (1996) ("What is important is that the circumstance be 'sudden, dramatic and unexpected.'"). Additionally, because unforeseeable business circumstances operate as an affirmative defense to WARN liability, the employer bears the burden of proving the existence of conditions giving rise to the exception. <u>General Dynamics</u>, 821 F. Supp. at 1311; 20 C.F.R. § 639.9 (1996).

In this case, the district court acknowledged the extreme difficulties experienced by the A-12 cocontractors during the latter half of 1990, culminating in the Government's December 17 communication indicating that the contract might be terminated for default. Despite these disquieting undercurrents, though, negotiations among the contracting parties were progressing favorably toward the end of the year; indeed, the court expressly found that, until the last possible minute, the Government and

McDonnell Douglas undertook extraordinary measures in an attempt to save the program. Against this backdrop of events, the court held that "termination of the A-12 contract was not reasonably foreseeable until January 7, 1991." Unlike Loehrer and Brandt, we find no fault in the district court's analysis.

### B.    Standard of Review

As an initial matter, the parties dispute the amount of deference we should give to the district court's ultimate determination that the facts of this case fall within the exception for unforeseeable business circumstances. It goes without saying, of course, that we review for clear error the district court's findings of historical facts, see Fed. R. Civ. P. 52(a), and it is equally plain that we evaluate de novo the trial court's construction and interpretation of a statute, Rifkin v. McDonnell Douglas Corp, 78 F.3d 1277, 1280 (8th Cir. 1996). When, as here, the district court has applied an objective legal standard to established facts, we are confronted with a mixed question of law and fact. See Ornelas v. United States, 116 S. Ct. 1657, 1661-62 (1996). Though we normally exercise plenary review over mixed questions, we will afford deference to the district court's decision if "application of the rule of law to the facts requires an inquiry . . . that is founded 'on the application of the fact-finding tribunal's experience with the mainsprings of human conduct.'" United States v. McConney, 728 F.2d 1195, 1202 (9th Cir.)(en banc), cert. denied, 469 U.S. 824 (1984); see also Nodaway Valley Bank v. Continental Casualty Co., 916 F.2d 1362, 1366 (8th Cir. 1990)(expressing approval for the Ninth Circuit's opinion in McConney).

There is some force to the argument that a deferential standard of review should guide our analysis in this case. Nevertheless, though this is undeniably an interesting quodlibet, we need not address the issue at present. Because affirmance would

be appropriate regardless of the weight we give to the district court's relevant conclusions, we save the resolution of this question for another day.[6]

## C.    Reasonable Foreseeability

We are mindful that an employer's commercially reasonable business judgment, rather than hindsight, dictates the scope of the unforeseeable business circumstances exception.  As such, a company will be excused from WARN liability if, when confronted with potentially devastating occurrences, it reacts as would reasonable employers within its own market.  See Chestnut v. Stone Forest Indus., Inc., 817 F. Supp. 932, 936 (N.D. Fla. 1993)("[T]he statute imposes a standard of commercial reasonableness, based on what a similarly situated employer would do in predicting the demands of its particular market.");  20 C.F.R. § 639.9(b)(2) (1996).  The Act and its regulations necessarily recognize that even the most conscientious employers are not perfect, and they thus allow needed flexibility for predictions about ultimate consequences that, though objectively reasonable, proved wrong.  So long as it may still fairly be said that the eventual plant closing or mass layoff is caused by a sudden, dramatic, and unexpected event outside the employer's control, the exception applies.[7]

---

[6]For analogous reasons, we need not decide whether to narrowly construe the exception for unforeseeable business circumstances.  Compare Carpenters Dist. Council v. Dillard Dep't Stores, Inc., 15 F.3d 1275, 1282 (5th Cir. 1994)("[T]his exception to the general rule is to be narrowly construed."), cert. denied, 115 S. Ct. 933 (1995) with 54 Fed. Reg. 16,061 (1996)("The Department has reviewed the legislative history and agrees that it may not [be] appropriate to say that the unforeseeable business circumstances . . . exception[] should be narrowly construed.").

[7]We join other courts in rejecting an interpretation of this exception which would require an employer to establish that it would not have been economically feasible to wait sixty days before instituting the plant closing or mass layoff.  See Jurcev v. Central Community Hosp., 7 F.3d 618, 624-625 (7th Cir. 1993), cert. denied, 114 S. Ct. 1830 (1994); Teamsters Nat'l Freight Indus.
Negotiating Comm. v. Churchill Truck Lines, Inc., No. 94-1004-CV-

11

See <u>Jurcev v. Central</u>

W-8, 1996 WL 480683, at *5 (W.D. Mo. Aug. 9, 1996)("The 'business circumstance exception' . . . does not impose upon an employer a requirement to provide sixty days notice or continue in business to its detriment for the sixty-day notice period, simply because it is economically feasible or possible to do so.").

Community Hosp., 7 F.3d 618, 625-27 (7th Cir. 1993)(analyzing facts to determine whether particular event was sudden, dramatic, and unexpected), cert. denied, 114 S. Ct. 1830 (1994); 20 C.F.R. § 639.9(b)(1) (1996).

After examining the record, we are convinced that the facts before us fall squarely within the exception for unforeseeable business circumstances. In so deciding, we certainly realize that the A-12 program fell upon rocky times in 1990. The scheduling delays and severe budgetary overruns, coupled with the Government's obvious unhappiness with the cocontractors' performance, would undoubtedly raise the eyebrows of any prudent businessperson. In fact, these events did not go unnoticed at McDonnell Douglas, as that corporation sent advisory memoranda to its employees explaining the precarious situation.

Despite this worrisome state of affairs, and under the totality of the circumstances, we think that the Government's cancellation of the A-12 contract was not reasonably foreseeable to McDonnell Douglas prior to January 7, 1991. To begin with, this case involves the rather unique, politically charged area of defense contracts. In this setting, the commercial reasonableness of McDonnell Douglas's reluctance to issue WARN notices, even after the Government's December 17 cure letter, is manifest. As noted by the district court, "the [G]overnment has rarely ever cancelled a contract for a program for which the [G]overnment had stated a need." The Government had most definitely stated a need for the A-12 fighter-bomber, and high level defense officials continued to tout the program as imperative to national security. Placing some

13

emphasis on this underlying context, we believe that McDonnell Douglas's conduct was in accord with what would be expected from a reasonable defense contractor. Cf. General Dynamics, 821 F. Supp. at 1312 ("General Dynamics officials were exercising reasonable business judgment in the context of their particular market when they concluded that termination was not a likely outcome.").

Moreover, other factors buttressed McDonnell Douglas's optimism. In the months preceding the program's cancellation, Congress expressed ongoing conditional support for the A-12, and the Navy's chief procurement officer indicated that the contractors had remedied the jet's structural defects. Also, upbeat negotiations progressed through early 1991, resulting in a draft of a Memorandum of Understanding exhibiting the Navy's willingness to restructure the agreement, and on January 2, 1991 Under-Secretary Yockey declared that the Government had no intention to terminate the contract. Given these developments, we have little difficulty in concluding that the Government's January 7 announcement was sudden, dramatic, and unexpected. Furthermore, while McDonnell Douglas admittedly was aware of the Government's dissatisfaction with the cocontractors' performance, that knowledge alone cannot in this case suffice to prevent the operation of the exception for unforeseeable business circumstances. See Wholesale & Retail Food Distribution Local 63 v. Santa Fe Terminal Servs., Inc., 826 F. Supp. 326, 332 (C.D. Cal. 1993)("This information [of a client's dissatisfaction], however, did not rise to the level of putting [the employer] on notice that the service agreement would be terminated."); Jones v. Kayser-Roth Hosiery, Inc., 748 F. Supp. 1276, 1286-88 (E.D. Tenn. 1990) (finding loss of major account unforeseeable even though client had vocalized displeasure with product).

In sum, McDonnell Douglas carried its burden of showing that the unforeseeable business circumstances exception applies in this

case.[8]  The termination of the A-12 program did not become reasonably foreseeable until January 7, 1991.  Because Loehrer and Brandt received notice as soon as practicable after that date, there was no violation of the WARN Act.[9]

## III.  CONCLUSION

The district court correctly determined that the exception for unforeseeable business circumstances shields McDonnell Douglas from liability under the WARN Act.  Consequently, we affirm the district court's entry of judgment in favor of the company.

AFFIRMED.

---

[8]This appeal is readily distinguishable from Carpenters, 15 F.3d at 1282, in which the Court of Appeals for the Fifth Circuit reasoned that a merger of two companies was not unforeseeable to the very corporations promoting the merger.  Here, in contrast to the situation in Carpenters, both the Government and McDonnell Douglas were working feverishly to prevent the occurrence of the event which caused the mass layoff.

[9]The former employees have also argued that McDonnell Douglas, at some earlier time, should have given them conditional notice.  The regulations permit conditional notice where the occurrence or nonoccurrence of some future event, which is certain to transpire, will necessarily lead within sixty days to a plant closing or mass layoff.  20 C.F.R. § 639.7(a)(3) (1996). To be sure, if the regulatory prerequisites to the issuance of conditional notice are satisfied, it seems that an employer would in most situations be well-advised to undertake notification in order to fend off the prospect of liability.  It is clear, however, that a decision whether to give conditional notice is committed to an employer's discretion.  See id. ("Notice may be given conditional upon the occurrence or nonoccurrence of an event . . . .").  Therefore, even assuming that it would have been appropriate for McDonnell Douglas to distribute conditional notice in the instant case, cf. 54 Fed. Reg. 16,059 (1989)("[C]onditional notice is permitted only if there is a definite event . . . ."), a failure to circulate conditional notice cannot, in itself, justify the imposition of WARN liability, see id. ("[T]he regulations specify that conditional notice is optional to avoid the problem of imposing liability on employers for failing to give a conditional notice.").

15

A true copy.

      Attest:

            CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.